**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim No. JRR-23-198 |
| TONY JOSHUA, | |
| Defendant. | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTIONS TO DISMISS THE INDICTMENT UNDER THE SECOND AMENDMENT,**
**TO SUPPRESS THE WARRANTLESS SEARCH OF PACKAGES, AND TO SUPPRESS**
**THE FRUITS OF THE DECEMBER 2022 AND JANUARY 2023 PREMISE SEARCHES**

**INTRODUCTION**

Defendant Tony Joshua illegally possessed firearms and ammunition in his home in Baltimore, Maryland. The Defendant was simultaneously being investigated by the Baltimore Police Department (BPD) for threatening his wife and her family members with a handgun, and Homeland Security Investigations (HSI) for illegally importing suppressors and manufacturing and trafficking privately made firearms. The Defendant was arrested and charged by BPD on December 1, 2022, for domestic assault. BPD also recovered a loaded privately made firearm from the Defendant's bedroom after executing a search warrant on his home.

On January 23, 2023, HSI executed a search warrant on the Defendant's home and recovered from the Defendant's basement an additional loaded firearm with suppressor attached and more ammunition. The Defendant was indicted federally on June 1, 2023, with one count of unlawful possession of ammunition by a convicted felon and one count of unlawful possession of firearms and ammunition by a convicted felon, both in violation of 18 U.S.C. § 922(g)(1). A

1

superseding indictment was filed on December 19, 2024, adding the privately made firearm to Count One and additional ammunition to both counts.

The Defendant now moves to: 1) dismiss the indictments under the Second Amendment (ECF No. 64); 2) suppress evidence seized during a warrantless search of packages addressed to the Defendant (ECF No. 65); 3) suppress the fruits of the December 2022 search by BPD (ECF No. 68); and 4) suppress the fruits of the January 2023 search by HSI (ECF No. 72). As detailed below, the motions should be denied as meritless.

## STATEMENT OF FACTS

On or about January 21, 2021, the United State Postal Inspection Service (USPIS) and United States Customs and Border Patrol (CBP) working at the John F. Kennedy Airport mail branch, intercepted a package addressed to "OG" at 4917 Midwood Avenue, Baltimore, Maryland 21212, while conducting an enforcement examination of mail received from a shipper from China suspected of illegally shipping firearms components. The package contained two firearm suppressors. The recipient's phone number on the package was 443-847-4520. This is a T-Mobile phone number registered to the Defendant, Tony Joshua, at the aforementioned address. The Defendant is the sole owner of the real property located at 4917 Midwood Avenue.

On or about August 4, 2022, USPIS and CBP intercepted another package from a company in China suspected of illegally shipping firearms components. The package contained two firearm suppressors addressed to "Tony J" at the same address and same phone number as the January 21, 2021, package. Law enforcement officers went to 4917 Midwood Avenue and observed a silver Audi sedan, bearing Maryland tag 3FC0425, registered to the Defendant, parked at the address.

On November 27, 2022, the Defendant became verbally and physically aggressive with his

2

wife, CW, at 4917 Midwood Avenue. CW's cousin was present for the Thanksgiving holiday. When the cousin defended CW, the Defendant punched the cousin in the face. The Defendant then retrieved a handgun and began waving it around in a threatening manner towards CW and her cousin. CW called her father to pick her and her cousin up from 4917 Midwood Avenue and take them someplace safe. The Defendant told CW that he would shoot her father if he intervened. The father arrived at 4917 Midwood Avenue and took CW and her cousin to another location where they stayed the night.

The next day, November 28, 2022, CW returned to 4917 Midwood Avenue hoping that the Defendant had cooled off and to assist in getting the children off to school. The Defendant continued arguing with CW and became aggressive towards CW. The Defendant then retrieved a black handgun and pointed it at the right side of CW's head. The Defendant then left the house and took his son to school. CW called a different cousin to pick her up. The two went to a wireless phone store located at 229 North Eutaw Street in Baltimore City and called police. BPD Ofc. Lepper arrived and took a statement from CW. CW showed Ofc. Lepper photos on her phone of guns the Defendant had at 4917 Midwood Avenue. Ofc. Lepper notified BPD Family Crimes of the domestic aggravated assault and Det. Cooper was assigned to the case. Ofc. Lepper then swore out charges for aggravated domestic assault against the Defendant and an arrest warrant was issued under case 2B02463449.

On November 29, 2022, Det. Cooper drafted a search and seizure warrant for 4917 Midwood Avenue. That same day, CW applied for and received a temporary extreme-risk protective order ("ERPO"), filed under 0101SP088252022, which ordered the Defendant to surrender all firearms. BPD SWAT Ofc. Levasseul served the ERPO on the Defendant at around

10:05 p.m. the following day. The Defendant was advised he had to surrender firearms. The Defendant advised police that he "doesn't own any firearms" and did not surrender any firearms to Ofc. Levasseul.

On December 1, 2022, at around 7:38 a.m., BPD Warrant Apprehension Task Force (WATF) officers responded to 4917 Midwood Avenue and found the Defendant and two children at the residence. WATF officers ordered the Defendant to open the door, but the Defendant refused. The Defendant appeared nervous to officers upon their arrival and the Defendant continued pacing back and forth between his first-floor bedroom and the front door, stating to police he needed his clothes, but never retrieving any clothes. After a couple of minutes, the Defendant eventually opened the front door and was placed under arrest for the domestic assault warrant. The Defendant stated he was naked under his towel and needed to go upstairs to check on his children. Some officers followed the Defendant upstairs to check on the children.

While the Defendant was upstairs with some of the officers, other officers remained downstairs. One of the officers on scene advised officers to call BPD Family Crimes to confirm the Defendant was in custody and to inquire as to the status of the search warrant that Det. Cooper had previously prepared two days prior. That officer also advised officers to call the BPD Northern District police station to send patrol officers to 4917 Midwood Avenue to secure the home while Det. Cooper swore out the search warrant for 4917 Midwood Avenue.

At around 7:42 a.m. BPD Sgt. Craig Streett, one of the officers who had remained downstairs, asked the other officers who remained downstairs if the rooms had been cleared. They responded that the rooms had not been cleared. Sgt. Streett then suggested that they do a protective sweep of the house and the officers agreed. Sgt. Streett grew concerned because the Defendant

mentioned he was naked and needed to go upstairs, but Sgt. Streett found the Defendant's clothes in the first-floor bedroom. Sgt. Streett advised his fellow officers to bring the Defendant and children downstairs so that he and another officer could clear the basement to make sure no one else was present inside 4917 Midwood Avenue.

At around 7:43 a.m., Det. Carpenter entered 4917 Midwood Avenue to assist Sgt. Streett in clearing the rest of the home. The officers cleared the kitchen, then the basement. Upon entering the basement, Sgt. Streett and Det. Carpenter immediately observed a rifle in plain view hanging on the wall.

Sgt. Streett thought it might be a "paintball" gun but suggested checking it to confirm. Sgt. Streett also observed a paper target with bullet holes hanging on a door next to the rifle. Det. Carpenter saw other firearms items in plain view near the rifle. Based on his observations, Sgt. Streett had Det. Carpenter secured the basement while Sgt. Streett relayed their observations to other officers upstairs. While Sgt. Streett was discretely relaying what he observed in the basement, the Defendant requested to go to the basement. Sgt. Streett directed other officers to not allow the Defendant to enter the basement based on the weapons that Sgt. Streett and Det. Carpenter had observed in the basement.

Sgt. Streett went upstairs to the second floor at around 7:46 a.m. to relay his observations to the officers who were upstairs with the Defendant and children. Upon relaying his observations to Det. Vargas, Det. Vargas said that Family Crimes was aware there would likely be firearms in the home based on the allegations contained in the arrest warrant and that Det. Cooper had already drafted a search warrant two days prior, which is why they needed officers on scene to secure the home until Det. Cooper and other Family Crimes detectives arrived to execute the search warrant.

Police eventually escorted the Defendant downstairs to the first floor and allowed the Defendant to retrieve clothes from the first-floor bedroom at around 7:46 a.m. At around 7:48 a.m., Sgt. Streett radioed a request for two officers to secure 4917 Midwood Avenue due to the size of the house and the "firearms all over the basement, like out in the open." Sgt. Streett also called for a vehicle to transport the Defendant for processing. The Defendant was removed from the home at around 7:57 a.m. and transported for processing.

At around 8:13 a.m., Sgt. Streett called Task Force Officer Joel Fried of the Bureau of Alcohol Tobacco Firearms and Explosives (ATF) to send an ATF special agent to 4917 Midwood Avenue based on Sgt. Streett's and Det. Carpenter's plain view observations in the basement, including multiple firearms, ammunition, a firearm with a machinegun conversion device attached, a drill press with a Polymer80 sticker attached, and other items suggesting to Sgt. Streett and Det. Carpenter, based on their training, knowledge, and experience, that the Defendant was manufacturing privately made firearms.









At around 12:39 p.m. BPD Family Crimes detectives and a BPD Crime Scene Unit Technician (joined later by ATF Special Agent (SA) Andrew Duncan) executed a search and seizure warrant at 4917 Midwood Avenue. From the Defendant's first-floor bedroom, a BPD detective located a green and black Polymer80 privately made firearm with no serial number, on a chair next to the Defendant's bed under his clothing. The firearm was loaded with twelve rounds of 9mm ammunition. Detectives also seized additional rounds of ammunition from the house. Detectives also found what they believed to be many firearms and firearms parts in the basement, but SA Duncan determined that all of the additional firearms located by BPD officers in plain view in the basement were replica airsoft models. However, SA Duncan did make notes of the drill press with a Polymer80 sticker commonly used to drill out privately made firearm frames, Polymer80 privately made firearm molds used to position the handgun frame for drilling, and various handgun parts, boxes, stickers, etc., used in constructing privately made firearms. BPD Family Crimes

detectives chose not to seize any of those items as not pertinent to their domestic violence investigation.

On December 5, 2022, the Defendant had a bail review in the domestic assault case and was held without bail. An interim ERPO was granted to CW the following day, again ordering the Defendant to surrender all firearms.

On December 11, 2022, Det. Cooper filed additional charges against the Defendant for the illegal possession of the privately made firearm and ammunition recovered from the Defendant's home on December 1, 2022. An additional arrest warrant was issued in case 6B02464720.

On December 15, 2022, CW appeared in Baltimore City District Court at North Avenue for a hearing and was granted a final ERPO for one year, through December 15, 2023, again ordering the Defendant to surrender all firearms.

On December 27, 2022, the Office of the State's Attorney for Baltimore City ("SAO") dismissed the felony assault charge against the Defendant in the domestic assault case and set the remaining misdemeanor assault charges for trial in District Court. On January 5, 2023, the Defendant was served with the arrest warrant for the illegal possession of the firearm and ammunition found in his bedroom and was held without bail in that case.

While the domestic violence investigation played out, SA Natt Otterson was investigating the Defendant based on the interception of firearms suppressors illegally ordered by the Defendant from a Chinese seller. SA Otterson issued grand jury subpoenas to eBay, KM Tactical, PayPal, and CashApp for records relating to the Defendant. SA Otterson discovered thirty-plus orders from eBay and KM Tactical by the Defendant for Glock firearms parts, Polymer80 firearms parts, and various other firearms parts from December of 2020 through January 2, 2023, being sent to 4917

Midwood Avenue. SA Otterson found these orders indicative of someone constructing Polymer80 privately made firearms.

On January 18, 2023, a judge in Anne Arundel County signed a search and seizure warrant for 4917 Midwood Avenue based on the intercepted packages of suppressors addressed to the Defendant and the firearms parts purchases made by the Defendant, in addition to the domestic assault events. The warrant was executed on January 23, 2023. The Defendant's vehicle was present, but the Defendant was not present due to his pretrial incarceration on the domestic assault case and firearm case. HSI agents executed the warrant. During the execution, a neighbor notified the agents that the Defendant was believed to be in jail. Agents looked up the Defendant in Maryland Case Search and saw that he had been charged in a domestic violence case. Agents contacted BPD TFO Donnie Hayes to gain more information about the case and to "deconflict." TFO Hayes confirmed with agents that the Defendant was arrested and charged on a domestic assault warrant but was unaware that a search warrant had been executed, items were recovered, and additional charges were filed.

During HSI's search, agents recovered a Walther model P22 .22 caliber handgun, bearing serial number WA259216, loaded with eleven rounds of ammunition, from the ceiling in a basement utility room. A suppressor was attached to the gun. Agents also recovered five shotgun shells, a .40 caliber magazine, a .22 caliber magazine, a Glock barrel, a .22 caliber high-capacity magazine, eleven more .22 caliber rounds of ammunition, and one 9mm round of ammunition. The agents found mail addressed to the Defendant at the location and observed various items of "firearm paraphernalia" such as paper targets with bullet holes, stickers of firearms parts companies, and boxes and bags from various orders from firearms parts companies, consistent

with the records obtained by SA Otterson.

The Defendant was charged in this case in a two-count indictment on June 1, 2023. A superseding indictment was filed on December 19, 2024. Count One charges the Defendant with the privately made firearm and ammunition recovered by BPD on December 1, 2022. Count Two charges the Defendant with the firearm, suppressor, and ammunition recovered by HSI on January 23, 2023. The Defendant is prohibited from possessing firearms and ammunition for prior felony convictions independent of the ERPO filed by his wife prior these searches occurring.

## ARGUMENT

### I.    The Defendant's Motion to Dismiss the Indictment Under the Second Amendment Should Be Denied Pursuant to Fourth Circuit Precedent.

Section 922(g)(1) is constitutional because (a) felons are not among "the people" protected by the Second Amendment; (b) the Second Amendment has historically been understood to protect law-abiding individuals, not convicted felons; and (c) the Second Amendment has historically been understood not to protect dangerous people, and felons, as a category, present a danger if armed.

The Defendant argues that 18 U.S.C. § 922(g)(1) is violative of the Second Amendment as applied to him, despite the binding precedent of *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024), to the contrary. The Defendant does not make a facial challenge to the statute, accepting the *United States v. Canada* holding that § 922(g)(1) is constitutional on its face. 123 F.4th 159, 161 (4th Cir. 2024). The *Canada* Court, however, left the door open for as applied challenges. *Id*. That door was closed by *Hunt*. "Having concluded 'there is no need for felony-by-felony litigation regarding the constitutionality of Section 922(g)(1), we reject appellant Matthew Hunt's as-applied challenge without regard to the specific conviction that established his inability to lawfully possess firearms." *Id*. (internal citation omitted). The Defendant, however, expounds at great length to try

to convince this court that 18 U.S.C. § 922(g)(1) has two separate classifications of violators. This Court can rest assured, it does not.

Section 922(g)(1) makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to possess a firearm or ammunition that is in or affecting commerce. The term "crime punishable by imprisonment for a term exceeding one year" does not include any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less. 18 U.S.C. § 921(a)(20)(B). While it may seem obvious, Congress has effectively eliminated a batch of state convictions as being disqualifying that would otherwise be felonies under federal law. Accordingly, however, those state crimes that are classified as a misdemeanor in their respective states and are punishable by imprisonment for more than two years count as disqualifying crimes, i.e. felonies, under Title 18, Section 922(g)(1). Under the current legal landscape, the varying "severity" of a prior Maryland conviction for first-degree murder compared to a conviction for rogue and vagabond is immaterial in the eyes of Section 922(g)(1): both are considered felonies under the statute, and both disqualify a person from possessing a firearm or ammunition under the statute. The Defendant, on the other hand, wants this Court to find and recognize a nonexistent carveout in the statute for "state misdemeanors" despite the fact that Congress has already done so in Section 921(a)(20)(B).

This Defendant has no less than four qualifying felony convictions. The fact that those convictions occurred in the state of Maryland and are classified as misdemeanors under Maryland state law matters not one bit under federal law. This Court is therefore required to hold § 922(g)(1)

constitutional as applied to him unless and until the Fourth Circuit or Supreme Court finds otherwise.

Additionally, the Defendant was the subject of an ERPO beginning on November 30, 2022, continuing through December 6, 2022, and finally continuing through December 15, 2022, through December 15, 2023, that would satisfy the requirements of 18 U.S.C. § 922(g)(8). Although Section 922(g)(8) requires a judicial determination that a person poses a threat, and the Defendant is not charged under that section, several parts of *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889 (2024), are helpful in understanding the ban on possession of firearms by felons in 18 U.S.C. § 922(g)(1) that also rely on legislative assessments that certain people pose a threat if armed.

*Rahimi* explicitly states that the Court's opinion does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901 (citing *Heller*, 554 U.S. at 626). To illustrate those "categories," the Court cites the portion of *Heller* that said the Court was not "cast[ing] doubt" on laws prohibiting "possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. *Rahimi* also reiterates that *Heller* did not "prohibit[ ] regulations that forbid firearm possession in the home"; indeed, *Heller* "stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " *Rahimi*, 144 S. Ct. at 1901-1902 (citing *Heller*, 554 U.S. 626-627 & n.26). Although not essential to *Rahimi*'s holding, the Court's reiteration of this statement from *Heller* (a statement that was absent from the majority opinion in *Bruen*) supports the position that

laws barring felons and the mentally ill from possessing firearms are constitutional.[1] Accordingly, *Rahimi* leaves ample room for laws such as Section 922(g)(1) because Congress has reasonably determined that felons "present a special danger of misus[ing]" firearms. *Rahimi*, 144 S. Ct. at 1901.

The Defendant here was found to possess firearms during the aforementioned time period, in violation of a court order, and Section 922(g)(8). Even after *Bruen*, the *Rahimi* Court has held that when an individual has been found by a court to pose a credible threat to the physical safety of another, that individual may be temporarily disarmed consistent with the Second Amendment; specifically, "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 702. If the Supreme Court has upheld the constitutionality of a temporary disarmament of a "temporarily" dangerous person, it seems they would certainly be poised to continue to uphold the disarmament of convicted felons, in agreement with *Hunt*, based on a finding that convicted felons fall outside of the class afforded Second Amendment protection—that is law-abiding citizens—even in a post-*Bruen* America. In any event, unless and until they decide to do otherwise, this Court is bound by *Hunt*.

## II.    The Defendant's Motion to Suppress Due to Warrantless Searches of Packages Should Be Denied.

---

[1] Before *Bruen*, three circuits held that *Heller*'s "presumptively lawful" statement was "not dicta," but part of its holding. *United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir.) (per curiam), cert. denied, 560 U.S. 958 (2010); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir.), cert. denied, 562 U.S. 921 (2010). The Government has taken that view as well. *See* Petition for Certiorari at 8, *Garland v. Range*, No. 23-374 ("The Court incorporated that understanding into its holding."). *Rahimi* did not clarify whether this was dicta or not, but nevertheless chose to reiterate it.

Routine border searches are a well-established exception to the warrant requirement, requiring neither probable cause nor even reasonable suspicion. *See, e.g., United States v. Flores-Montano*, 541 U.S. 149, 151–57 (2004); *United States v. Ramsey*, 431 U.S. 606, 619 (1977); and *United States v. Ickes*, 393 F.3d 501, 504–06 (4th Cir. 2005) (authority in 19 U.S.C. § 1581(a) to search "any … cargo" allows search of computer and computer discs on which child pornography was found, rejecting defendant's argument in favor of a "First Amendment exception" to border search doctrine). "[A] border search that goes beyond the routine is nevertheless justified merely by reasonable suspicion, a lesser standard than required for analogous non-border searches." *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995), *citing United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985). The border search exception to the Fourth Amendment applies to searches at points of entry (or exit), such as ports and airports, which are "the functional equivalent of the border." *Oriakhi*, 57 F.3d at 1295 n.2, *citing Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73 (1973). Finally, in *Oriakhi* the Fourth Circuit definitively held "that the *Ramsey* border search exception extends to all routine searches at the nation's borders, irrespective of whether persons or effects are entering *or exiting* from the country." *Id*. at 1297 (emphasis added).

This case involves nothing more than two routine border searches of packages in violation of customs law carried out by authorized customs agents. USPIS and CBP agents working at the John F. Kennedy postal branch seized packages shipped from international sellers in China as part of a routine inspection pursuant to 19 U.S.C. § 482 and 27 C.F.R. 447.52. Upon inspection, they discovered firearms suppressors in violation of that statute and regulation. Even if the packages were not subjected to routine customs inspection, USPIS, CBP, and HSI agents are familiar with

certain shippers and sellers from China, as well types of packaging they use, to try to conceal the illegal sale and transport of firearms suppressors into the United States. Those agents would be able to articulate, based on their training, knowledge, and experience, when they identify specific packages, not subject to routine inspection, based on reasonable suspicion that the packages may contain contraband. The packages seized and inspected in this case complied with a proper border search. Accordingly, the Defendant's motion must be denied.

### III. The Defendant's Motion to Suppress the Fruits of the December 2020 Searches Should Be Denied.

#### A. Police Conducted a Proper Buie Protective Sweep Search of 4917 Midwood Avenue on December 1, 2022, All Contraband Was Observed in Plain View, and No Violative Searches Occurred During the Sweep.

Protective sweep searches of buildings incident to the arrest of an individual in or immediately outside a dwelling or building are permissible to protect the safety of the arresting agents or officers. *Maryland v. Buie*, 494 U.S. 325, 334–36 (1990) (permitting search "incident to arrest … as a precautionary matter and without probable cause or reasonable suspicion, … [of] closets and other spaces immediately adjoining the place of arrest" and search beyond the immediately adjoining areas, when there are "articulable facts which, taken together with rational inferences …, warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a threat to those on the arrest scene"). However, "only to a cursory inspection of those spaces where a person may be found" is permitted under this exception to the warrant

requirement, and the sweep search may last "no longer than it takes to make the arrest and depart the premises." *Id*. at 335–36.[2]

In *United States v. Laudermilt*, 677 F.3d 605 (4th Cir.), cert. denied, 568 U.S. 955 (2012), officers investigating a report of threats of domestic violence involving a gun conducted a protective sweep of the residence after the defendant was taken into custody. After the only individual in the house was secured, a firearm was observed in plain view on a gun rack and the officers completed their protective sweep, which altogether lasted about five minutes. In reversing the district court's suppression of the evidence (on the reasoning that the firearm was discovered after the requisite "exigent circumstances" ceased to exist), the Fourth Circuit noted "confusion about how many people were in the house that evening" and the fact that officers were investigating "a potentially violent domestic confrontation." *Id*. at 611. The Court also noted that a "measure of pragmatism" is appropriate when determining whether officers investigating potential "grave danger" have crossed the Fourth Amendment line:

> As we have previously explained, "[w]e are to approach the Fourth Amendment … with at least some measure of pragmatism. If there is a grave public need for the police to take preventative action, the Constitution may impose limits, but it will not bar the way." *Mora*, 519 F.3d at 222. The district court's ruling failed to "recognize that unaccounted-for third parties with access to firearms may present a grave danger to arresting officers." *Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colorado*, 469 F.3d 957, 962 (10th Cir. 2006). That grave danger permitted the officers to conclude the sweep of the entire house. In addition, the entire sweep lasted about five minutes; this was not a situation where the officers secured a third-party and used that as a justification for a broad-reaching or lengthy additional search. *See, e.g., Id*. at 961–62 (upholding sweep with duration of five

---

[2] *See also Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *United States v. Everett*, 91 F.4th 698, 709–11 (4th Cir.), cert. denied, 145 S. Ct. 242 (2024); *United States v. Cephas*, 254 F.3d 488, 491 (4th Cir. 2001); *United States v. Gwinn*, 219 F.3d 326, 332 (4th Cir.), cert. denied, 531 U.S. 1025 (2000); and *United States v. Bernard*, 757 F.2d 1439, 1443 (4th Cir. 1985).

minutes); *United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995) (same); *United States v. Delgado*, 903 F.2d 1495, 1501–02 (11th Cir. 1990) (same).

*Id*. (reversing suppression ruling, remanding for further proceedings).

The instant case is no different: unaccounted-for third parties with access to firearms may present a grave danger to arresting officers. Sgt. Streett said as much repeatedly while inside of 4917 Midwood Avenue. From the moment Sgt. Streett and Det. Carpenter entered the basement, they saw a short barrel rifle with suppressor and two more handguns in plain view hanging on the wall. Near those firearms, they saw two more handguns and a firearm magazine in plain view on a desk, one of which Det. Carpenter observed to have a machinegun conversion device attached, as well as rounds of .22 caliber ammunition next to them. Det. Carpenter also noted that the Defendant has "got gun parts everywhere" leading Det. Carpenter to believe that the Defendant was building and/or selling privately made firearms. Det. Carpenter finished clearing the basement after Sgt. Streett went upstairs to report what they had already observed and saw three more rifles in plain view in another room of the basement.

By this point, police knew that the Defendant had been arrested on a warrant for a domestic assault involving the use of a firearm. Police had also seen what they believed to be an illegal machine gun coupled with evidence of firearms trafficking. They also knew that a search warrant had been authored two days prior and was in the process of being sworn out. As is typical, WATF secured the premises and requested additional officers to secure the integrity of the house and its contents while that search warrant authorization was underway. However, due to the size of the house and the number of firearms and ammunition observed by police in plain view in the basement, officers also had concerns that someone could access the basement from the rear exterior basement door. Accordingly, they had a WATF member remain in the basement to secure the

location. A police major also came by to inspect the scene, including the plain view contraband in the basement, because WATF members had requested two officers to secure the location instead of the typical one—one at the front door and one at the rear door in case someone tried to access the basement from the rear door. Police conducted a proper protective sweep search and then immediately went into securing the location and its contents, including any contraband or evidence authorized to be seized in the search warrant, in preparation of the search warrant. At no time did Sgt. Streett or Det. Carpenter search any items or containers in the basement or enter any room or area of the basement where a person could not be found. The inquiry can stop at that point and the Defendant's motion can be denied based on no Fourth Amendment violation occurring during the protective sweep search.

However, even if police had gone beyond what is permissible under *Buie*, police obtained a proper search warrant for the location in advance of the arrest. The Defendant claims that "the subsequent search warrant cannot save the government from the consequences of suppression, as the decision to seek the warrant was obviously prompted by the unlawful search." ECF No. 68 at 6. In reality, Det. Cooper sought a search warrant in advance of arresting the Defendant based on the two separate incidents of the Defendant threatening CW and her family with a firearm at 4917 Midwood Avenue. In fact, Det. Cooper prepared the search warrant for 4917 Midwood Avenue on November 29, 2022—two days prior to the Defendant's arrest and subsequent execution of the warrants. Government Production One at USAO-000387. In addition to Det. Cooper documenting that fact in her case file, she clearly had notified WATF officers, including Det. Vargas who explained to Sgt. Streett that Det. Cooper had sought a search warrant two days prior, which is why they were securing the house with officers until the Family Crimes detectives arrived with

the search warrant for execution. Det. Carpenter did not say go get me "a" search warrant, he said go get me "the" search warrant—the one Det. Cooper had prepared two days prior.

Accusing police of a "search first, warrant later" mentality here is preposterous. Det. Cooper's decision to seek the search warrant was not based on anything that WATF discovered, but instead on the crimes committed by the Defendant on November 27 and 28, 2022. The issuing court could have and would have found probable cause and issued the search warrant based on those facts alone. The Defendant even admits as much. While WATF did not exceed the scope or conduct an illegal search, the independent source doctrine would still be satisfied; particularly the privately made firearm and ammunition discovered in the Defendant's bedroom by the Family Crimes detectives during the execution of their search warrant—not by WATF members.

The Defendant claims that the protective sweep search ended upon locating the Defendant, and that police were not authorized to enter the basement, but that is contrary to law and common sense. By that logic, police would not be allowed to leave the living room upon entry into the house despite the fact that the Defendant explained to police that at least two more people were inside of the house. The Defendant claims that police have no specific and articulable facts that there was anyone in the basement. The Defendant refused to open the door. The Defendant paced back and forth between the first-floor bedroom and the front door. The Defendant said he needed clothes from the bedroom but never got any. Then the Defendant said he needed clothes upstairs. The Defendant raised suspicion with officers that he was not being truthful during their entire interaction. This was evident by police reaction and comments they made captured on their body-worn cameras. Serving arrest warrants and executing search warrants is extremely dangerous work. The courts, including the Fourth Circuit, clearly recognize that fact, thus permitting police

to conduct a protective sweep search of a home during the execution of an arrest warrant for police safety and the safety of everyone involved. Courts have also recognized the securing the premises exception, which is immediately what the officers did here upon concluding their protective sweep search of the location.

The Defendant, on the one hand, claims that police exceeded the scope of a permissible protective sweep search, but then simultaneously complains that they did not include additional inculpatory information in the affidavit such as additional potential firearms, ammunition, and evidence that the Defendant was manufacturing firearms, all of which were seen in plain view during the initial protective sweep search. Police were allowed to enter the Defendant's home and arrest him. Police were allowed to conduct a protective sweep search of the entire home, including the basement. Police did not exceed the scope of the protective sweep search. Upon the conclusion of that protective sweep search, police are permitted to secure the premises while a search warrant is sought. Police are permitted to record their plain view observations made during the protective sweep search and include them as additional inculpatory evidence in an affidavit for that search warrant. Police followed the law at each step of the process here. Accordingly, the motion to suppress the fruits of the December 2022 search must be denied.

> **B.    Alternatively, Even if BPD Exceeded the Scope of a Protective Sweep Search, The Contraband Charged In Count One Would Have Been Inevitably Discovered**.

In *United States v. Troxel*, 564 F. Supp. 2d 1235 (D. Kan. Jun. 17, 2008), Norma Troxel called police to report a domestic dispute involving her husband, John Troxel. *Id*. at 1240. Upon police arrival, Mrs. Troxel consented to their searching the house. *Id*. They did not find Mr. Troxel present but did find drugs. *Id*. Police returned the next day at Mrs. Troxel's request, found Mr.

Troxel, and arrested him. *Id*. Subsequent to that arrest, police obtained a state search warrant for drugs. *Id*. Upon execution, police recovered marijuana seeds and a smoking device. A federal search warrant was authorized on August 2, 2006, where numerous firearms were seized from the Troxel residence. *Id*. The Court denied the suppression of contraband found in plain view, but suppressed contraband found inside of a cooler. *Id*. The Court found that Mrs. Troxel did not have authority to consent to the search of the "gun room." *Id*. at 1241. The Court goes on to reference the Tenth Circuit factors it considers in evaluating whether inevitable discovery applies, primarily focusing on whether the warrant process had begun, whether probable cause existed prior to the search, if a warrant was ever obtained, and whether police had "jumped the gun." *Id*. The facts of *Troxel* could not be further from what occurred in this case.

In *Troxel*, police did not have consent to search the area where contraband was suppressed. Here police had a proper arrest warrant for the Defendant, conducted a proper protective search sweep, properly secured the premises, obtained a search warrant, and executed that search warrant. Most distinguishable is the fact that the December 2022 search warrant was authored two days before BPD entered the Defendant's home. While the affiant in this case did include items observed by officers in plain view during the protective sweep search, the warrant would have been issued even absent that inclusion. More importantly, those observations during the protective sweep search were ones made of contraband in plain view—not through an illegal search into containers (like a cooler) exceeding the scope of a protective search sweep. BPD met all four of the Tenth Circuit "*Cabassa* factors" the Defendant hangs his hat on in determining whether inevitable discovery applies. To be clear, there was no illegal search by BPD (or HSI), but even in

a different factual universe where there was, the inevitable discovery doctrine applies because police met all of the factors along the way.

Under the "inevitable discovery" doctrine, first articulated by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 444 (1984), improperly seized evidence may nevertheless be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *See United States v. Bullette*, 854 F.3d 261, 266–67 (4th Cir. 2017). Despite there being no illegal search at any point in this case, the contraband charged would have still been lawfully inevitably discovered and is thus admissible at trial.

### IV. The Defendant's Motion to Suppress the Fruits of the January 2023 Search & Request for a *Franks* Hearing Should Be Denied.

To be entitled to relief or even a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), commonly referred to as a *Franks* hearing, a defendant must make a "dual showing … which incorporates both a subjective and an objective threshold component." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). First, to be entitled to a hearing the defendant "must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," *Franks*, 438 U.S. at 155–56 (quotations omitted) (sometimes referred to as the "intentionality prong"). Second, the offending information must be essential to the probable cause determination; that is, if the offending information is excluded and probable cause still remains, no *Franks* hearing or relief is required, *id.* (sometimes referred to as the "materiality prong").

The Fourth Circuit first applied *Franks* to intentional, material omissions in *Colkley*, 899 F.2d at 301–02. To successfully attack an affidavit based on omitted information, the defendant

must show: (1) that the information was omitted "with the intent to mislead the magistrate or … with reckless disregard of whether it would make the affidavit misleading"; and (2) that inclusion of the omitted information in the affidavit was material to the determination of probable cause. *United States v. Lull*, 824 F.3d 109, 115–20 (4th Cir. 2016) (omission of fact that confidential informant attempted to steal money from officers after his controlled buy of drugs, for which he was indicted and terminated as a cooperating informant, was at least reckless and was material to probable cause, reversing conviction).

*Accord United States v. Haas*, 986 F.3d 467, 474–77 (4th Cir.) (affirming denial of motions for Franks hearings where affidavits omitted informant's criminal history and unrelated criminal conduct, failed to report on informant's reliability in past cases, and omitted any "corroborating evidence of her claim that she saw child pornography on defendant's laptop"), cert. denied, 142 S. Ct. 292 (2021); *United States v. Wharton*, 840 F.3d 163, 169–71 (4th Cir. 2016) (affirming denial of suppression motion following *Franks* hearing where recklessly omitted information would not have defeated probable cause); *United States v. Blauvelt*, 638 F.3d 281, 289–90 (4th Cir.) (affirming denial of motion for *Franks* hearing based on omission of facts in public record but about which no member of the law enforcement team had "actual knowledge," and concluding that inclusion of omitted facts would not defeat probable cause finding in any event), cert. denied, 565 U.S. 823 (2011); *United States v. Clenney*, 631 F.3d 658, 664–65 (4th Cir. 2011) (affirming denial of motion for *Franks* hearing based on omissions which were neither "designed to mislead the magistrate" nor "material"); *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017) (*Franks* hearing not required where defendant failed to establish that agent's statements were false or were made "knowingly and intentionally, or with reckless disregard for the truth"); *United States v.*

*Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (*Franks* hearing not required where inaccurate statements in affidavit regarding a handgun being in plain view "were unnecessary to the probable cause determination"); *United States v. Akinkoye*, 185 F.3d 192, 199 (4th Cir. 1999) (*Franks* hearing not required where probable cause existed apart from alleged inconsistencies in affidavit), cert. denied, 528 U.S. 1177 (2000); and *United States v. Gray*, 47 F.3d 1359, 1364–65 (4th Cir. 1995) (*Franks* hearing not required absent "substantial preliminary showing" that affiant made knowing and intentional false statements).

As the Court noted in *Colkley*, 899 F.2d at 301–02, all known exculpatory information need not be included in an affidavit, and omission of information is less likely to require a *Franks* hearing than is the knowing inclusion of false information. *See also United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994) (noting defendant's heavy burden in establishing need for *Franks* hearing); and *United States v. Chavez*, 902 F.2d 259, 265 (4th Cir. 1990) (defendant must show that agent affirmatively tried to mislead magistrate to warrant Franks hearing; ambiguity or lack of clarity is insufficient). The facts of this case are in accord with Fourth Circuit precedent that the Defendant is not entitled to a *Franks* hearing.

### A.    The January 2023 Search and Seizure Warrant for the Defendant's Home Contained No False or Misleading Information.

The Defendant stakes his claim for a *Franks* hearing on the following paragraph in the January 2023 warrant:

> BPD has made no attempts to retrieve the above firearms from the residence, it is believed that the above listed firearms are still in the TARGET RESIDENCE, none were seized at the time of the above incident and there are no records of seizure or forfeiture by the victim and/or JOSHUA.

ECF No 72-2 at 4. The "firearms" the affiant is referring to includes a black semi-automatic handgun that the Defendant pointed at CW, and photographs of "several firearms that JOSHUA had in their house to include two handguns and a rifle." *Id.*

Unknown to the affiant at the drafting of the January 2023 search warrant, BPD had executed a search warrant at the same location in December 2022, and had retrieved a privately made firearm and ammunition, but had left behind other firearms, ammunition, and other contraband because BPD was conducting a domestic assault investigation pursuant to their search warrant, not an investigation into illegal firearms manufacturing and trafficking. The Defendant complains that BPD "thoroughly searched the home and seized several firearms and related evidence,' but even that statement is inaccurate. BPD seized a privately made firearm loaded with 9mm ammunition, a box of .40 caliber ammunition, some .22 caliber ammunition, and an airsoft pistol. BPD did not seize all of the firearms referenced in the affidavit.

The affiant officer made no intentionally false or misleading statements or omissions in the affidavit. The affiant officer made no recklessly false or misleading statements or omissions in the affidavit. In fact, quite the opposite is true. During the course of their investigation, HSI discovered that the Defendant was arrested for domestic assault. As is customary for law enforcement agencies, they reached out to a counterpart at BPD to "deconflict" their investigation, ensuring there was no overlap in their own investigation. The agents contacted BPD TFO Donnie Hayes who confirmed that the Defendant had been arrested and charged with domestic assault, but did not locate or provide any information about a subsequent search warrant being executed in December 2022, and that some of the items (indeed not all) had been recovered by BPD. The agents did the exact opposite of intentionally misleading or acting with reckless disregard: they

tried to obtain the proper information in which to present to the Court. As a result, the Defendant does not make it past the first prong to justify a *Franks* hearing.

      **B.**      **The January 2023 Warrant Contains Probable Cause Even Absent the Paragraph in Question or Even with an Indication That Firearms and Ammunition were Previously Seized By Another Law Enforcement Agency.**

Even if the Defendant could survive the first prong, which he does not, the statement the Defendant claims is false or misleading does not defeat probable cause. Whether the paragraph at issue was removed or included up-to-date information does not materially affect the probable cause determination based on a wholly independent investigation by HSI into the Defendant's desire to illegally import suppressors and manufacture privately made firearms. If the court were to "correct" the affidavit, probable cause still exists.

First, if the paragraph were removed in its entirety, probable cause surely still exists. Second, if the affiant had the full picture of the domestic assault investigation from BPD TFO Hayes, the affiant would have explained to the issuing court that while BPD had executed a search warrant in an attempt to retrieve an "unknown caliber, make, model, and serial number of Black colored semi-automatic handgun, ammunition, holster, gun cleaning kit," some of the listed firearms still remain at the residence. In fact, the affiant would have further learned that BPD had seen in plain view substantial evidence supporting the firearms manufacturing and trafficking investigation being conducted by HSI. The January 2023 search warrant affiant would have included that information in the affidavit and the fact that none of it had been seized by BPD only strengthens probable cause for a subsequent search of the home.

The Defendant has not made a substantial preliminary showing of falsity or materiality and therefore fails the second prong. Accordingly, the Defendant is not entitled to a *Franks* hearing and the request for one must be denied.

### V.   Alternatively, Investigators Relied on the Search Warrants in Good Faith and the Fruits of the Warrant are Therefore Admissible

Finally, even if probable cause were found to be lacking in either of the search warrants based on the Defendant's allegations that paragraphs should be removed, added, or modified, police were entitled to rely on the facially valid warrants and the resulting evidence is admissible pursuant to the "good faith" exception of *United States v. Leon*, 468 U.S. 897, 922 (1984). "Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993), quoting *Leon* at 926 (internal quotations omitted).

Here, the warrants were facially valid and any reasonable law enforcement officer would have relied on the warrants. There is no evidence and no basis to believe that the authorizing judge abandoned their judicial role in issuing the warrant. Therefore, even assuming for argument that the warrants were invalid (which they were not), the Court may still receive the evidence under the good faith exception to the exclusionary rule.

Investigators here followed the law at every step of the way and the law supports their actions regardless of whether the Court wants to believe none, some, or all of the Defendant's complaints. Accoringly, his motion to suppress the warrants and derviative evidence should be denied.

**CONCLUSION**

Section 922(g)(1) is facially constituional and the Defendant is legally barred from making an as applied challenge. No Fourth Amendment violations occurred when agents intercepted illegally obtained suppressors desited for the Defendant from China. No Fourth Amendment violations occurred during the December 2022 protective sweep nor during the application for or exectuion of the December 2022 search warrant. No Fourth Amendment violations occurred during the appplication for or the exeuciton of the January 2022 search warrant. Accordingly, the Court must deny the Defendant's motion to dismiss the indictment and motions to suppress evidence seized in this case.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:     _____/S/_____
James I. Hammond
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed electronically on January 30, 2026, via CM/ECF and in the process a copy of the same was served via CM/ECF on counsel of record.

_____/s/_____
James I. Hammond
Assistant United States Attorney